IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAKE EARL HENDRIX, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-3451 |
| | § | |
| R. JENKINS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Jake Earl Hendrix, a state inmate proceeding *pro se*, filed this section 1983 lawsuit against Jeffrey Sanders, John Christian, and Captain R. Jenkins for alleged violations of his civil rights. Defendants Sanders and Christian filed a motion for summary judgment (Docket Entry No. 45), to which plaintiff filed a response (Docket Entries No. 48, 49). Defendant Jenkins filed a separate motion for summary judgment (Docket Entry No. 50), to which plaintiff filed a response (Docket Entry No. 56).

Based on consideration of the pleadings, the motions and responses, the record, and the applicable law, the Court **GRANTS** defendants' motions for summary judgment and **DISMISSES** this case for the reasons that follow.

**I. CLAIMS FOR RELIEF**

Plaintiff seeks compensatory and punitive damages against defendants for their alleged deliberate indifference to his serious medical, mental health, and safety needs.

Plaintiff claims that on April 22, 2011, following his suicide attempt, defendants declined to transfer him to one of the prison system's two psychiatric units. Plaintiff further claims that defendants failed to provide him proper mental health treatment before and after the suicide attempt, and that he injured his back falling during the suicide attempt. Given a liberal construction, plaintiff's lawsuit claims that defendants were deliberately indifferent to his health and safety immediately before and after his suicide attempt.

Defendants move for summary judgment dismissing plaintiff's claims, and argue that plaintiff received reasonable and necessary mental health and medical care at all times relevant to his lawsuit.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court may not weigh the evidence or make credibility determinations. *Id.* Conclusory allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are insufficient to defeat a summary judgment motion. *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754–55 (5th Cir. 2000).

## III. ELEVENTH AMENDMENT IMMUNITY

To the extent plaintiff seeks monetary damages against one or more defendants in their official capacity, such claims are barred by Eleventh Amendment immunity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Defendants are entitled to summary judgment dismissal of plaintiff's claims for monetary damages against them in their official capacity.

## IV. DELIBERATE INDIFFERENCE

Deliberate indifference to a prisoner's serious medical or safety needs constitutes an Eighth Amendment violation and states a cause of action under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 105–07 (1976). Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*, 429 U.S. at 104.

Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official is not liable for deliberate indifference unless the official knows of and disregards an excessive risk to an inmate's health or safety.

*Id.* The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also actually draw the inference. *Id.* The plaintiff must show that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

In support of their motion for summary judgment, defendants Sanders and Christian submitted an expert witness affidavit of Dr. Shana L. Khawaja, a licensed clinical psychologist, who testified as to the medical care plaintiff received before and after his attempted suicide of April 22, 2011:

> I have been asked to review [plaintiff's] medical records in order to provide an expert medical opinion(s) [sic] as to the mental health care provided to Jake Hendrix by John Christian, Mental Health Case Manager, and Jeffrey Sanders, Mental Health Manager. [Hendrix] alleges that on April 22, 2011, he attempted suicide by hanging after requesting mental health treatment on numerous occasions. [He] claims that he sustained injury to his back when he fell to the floor when the sheet tore during his suicide attempt and that he fell unconscious to the floor. [Hendrix] further claims that he was denied a mental health transfer to an inpatient mental health care facility due to budget cuts.
>
> From November 2010 until the attempted suicide, [Hendrix] only submitted one sick call request for mental health care. On December 28, 2010, a sick call request was received from [Hendrix] because he was 'having mental problems' regarding his work assignment. The record notes [Hendrix] did not want to work in the hoe squad and stated, 'they got guns and I don't have one and I'am

[sic] to [sic] nervous for that and I'am [sic] not going to let them kill me.' [Hendrix] was informed that 'he should contact TDCJ's unit classification and security concerning his job assignment.' The patient was later reassigned to inside medical squad. The record indicates the patient was happy he did not have to return to the fields and at no time presented suicidal or self-harm ideations. [Hendrix] was seen by five different mental health providers between November 1, 2010, and April 21, 2011, and none of them noted the patient reporting any suicidal or self-harm ideations at any time.

On April 22, 2011, at 7:10 pm, [Hendrix] was brought to the Estelle Unit Emergency Room after being cut down by TDCJ officers during an attempted suicide by hanging. The record notes the patient was unresponsive and was sent out by ambulance to a local hospital for evaluation of a possible neck injury. [Hendrix] was sent to Huntsville Memorial Hospital where a CT scan was performed on the patient's brain/head and cervical spine. Both CT's [sic] were normal with no abnormalities. The Memorial Huntsville Hospital record notes that the patient indicated that his cell block was in trouble for others acting out causing sadness in [Hendrix], so he tried to hang himself. [He] denied any difficulty breathing, swallowing, headache or other injury. The physical examination showed the patient's back was non-tender. After undergoing medical evaluation, CT testing and laboratory workup, all with negative results, [Hendrix] was returned to the Estelle Unit in stable condition at 1:30 am on April 23, 2011. At that time, the patient continued to report complaints of feeling depressed and suicidal. [Hendrix] was placed under Constant Direct Observation by Dr. Smith and was scheduled to be seen by mental health for evaluation on Monday, April 25, 2011. According to the record, [Hendrix] was not sent to Crisis Management at the Skyview or Jester IV facilities because there were no beds available.

[Hendrix] was evaluated by Mr. Sanders three days later on April 25, 2011. The normal Crisis Management stay is generally three days[,] the equivalent to [Hendrix's] stay in Constant Direct Observation. The record notes the patient was angry about being housed in G4 custody and did not like the mass punishment given when there were only six troublemakers on his block. At that time, [Hendrix] denied any current plans for suicide or self-harm and there was no evidence [he] required inpatient mental health treatment. Based upon Mr. Sander's evaluation, available data, and the fact that [Hendrix] no longer had suicidal or self-harm ideations[,] the patient was released back to a cell and orders were given for the patient to be rescheduled for clinic.

> [Hendrix] was seen again on May 9, 2011, and he reported to be 'doing better since he has been transferred to another wing.' My review of the patient's records showed no further issues with suicidal ideation.
>
> Summary:
>
> [Hendrix] did not report any suicidal ideations prior to his attempted suicide on April 22, 2011. There is nothing to indicate that Mr. Christian or Mr. Sanders had any previous knowledge that [Hendrix] may attempt suicide or sought mental health treatment. Neither Mr. Sanders [n]or Mr. Christian were responsible for [Hendrix] not being sent out to Crisis Management. Therefore, the Defendants cannot be held responsible for the patient's attempted suicide or his alleged back injury.
>
> The above opinion is based upon by [sic] review of the records noted above and reasonable medical probability.

(Docket Entry No. 45, Exhibit D.) Defendants have also submitted, under seal, copies of plaintiff's medical records for the relevant time frame. (Docket Entry No. 46.)

    A.    <u>Deliberate Indifference Before the Incident</u>

Plaintiff contends that defendants failed to provide him proper and adequate mental health care immediately before his suicide attempt. In particular, he argues that defendant Jenkins had refused to allow plaintiff to be sent to "mental health" some time before the suicide attempt because plaintiff's cellblock was on lockdown.

Plaintiff's medical records as submitted by defendants show that, on January 3, 2011, plaintiff was seen by Estelle Unit outpatient mental health services, following his placement in administrative segregation housing for disciplinary purposes. (Docket Entry No. 46, p. 1.) Plaintiff reported that he had no problems and was doing fine, denied having any self-harm

ideations, and was without any acute distress. Over the next few weeks he underwent ear drops treatment for impacted cerumen, which resolved without incident. *Id.*, pp. 3–13. On February 21, 2011, he injured his finger in his cell door, and the injury was examined and treated without complications. *Id.*, pp. 18–24. He was again examined by outpatient mental health services on March 30, 2011, for housing clearance after receiving a disciplinary charge for causing a disturbance and refusing to follow orders. *Id.*, p. 25. Plaintiff made no sick call requests and no additional medical or mental health services were requested until April 22, 2011, the day of his suicide attempt.

Medical records for that incident show that plaintiff was found unconscious in his cell with a torn sheet wrapped around his neck. Prison officers removed the sheet, applied a cervical collar around his neck, and removed him from the cell on a back board. He was taken to the unit's emergency room, where a small cut over his eye was cleaned and treated. He was then examined and transported by ambulance to a local hospital emergency department. CT scans and x-ray films of his neck, brain, and spine were normal, and no fractures, dislocations, or other internal injuries were found. All laboratory tests were normal. *Id.*, pp. 27–62. Plaintiff told emergency personnel that he attempted to hang himself because he was depressed over his cell block "being in trouble," and that he still felt suicidal. *Id.*, p. 50. Upon his return to his prison unit, he was placed under continuous direct observation ("CDO"). *Id.*, p. 52. Plaintiff's pre-crisis management health evaluation noted

7

that he would remain under continuous direct observation at the unit because no beds were available at the two psychiatric units, Skyview and Jester IV, at that time. *Id.*, p. 61.

Dr. Khawaja's affidavit testimony and the medical records show that medical and mental health care providers, including defendants, responded to plaintiff's medical and mental health needs, provided him antidepressants and other psychiatric medications as needed, and maintained regular mental health follow-ups prior to the incident. Plaintiff's medical records reported no indications that plaintiff was suicidal or having any self-harm ideations during the months, weeks, and days immediately prior to the suicide attempt. Although plaintiff claims that defendant Jenkins prevented his being seen by "mental health" a few hours before the suicide attempt, plaintiff's own grievance refutes that claim. In his grievance, plaintiff stated that he asked to see "mental health" on April 22, 2011, prior to the incident because of the stress from a lockdown, and that prison Ojeda accompanied plaintiff from his cell to the clinic:

> On April 22, 2011, as I was being taken to mental health by Sgt. Ojeda, we where [sic] stopped by Captain Jenkins at central control desk. Captain Jenkins pacifically [sic] asked Sgt. Ojeda where he was taking me. Sgt. Ojeda told Captain Jenkins that I'm suicidal and he was taking me to be seen by mental health. Captain Jenkins said you picture [sic] that. What wing is he from? Sgt. Ojeda told Captain Jenkins I was from K-1-Wing. And Captain Jenkins said 'Take his a- -' back down there. Then said "No" take him too [sic] mental health. Then take his a- - back down there. So Sgt. Ojeda took me to mental health and I was talking to Mr. Saunders [sic] after Sgt. Ojeda had told him I told him I was suicidal. Counselor Christian walked up and handed Mr. Saunder [sic] a note after Mr. Christian had got off the telephone. With Captain Jenkins. After Mr. Saunder [sic] read the note he told me that there's not much he can do for me. Because the budget cuts don't let them

8

> send inmates to Jester or Skyview anymore. And then I was taken back to K-1-Wing and they removed my roomate [sic]. And the same day I got so suicidal I hung myself. . . . Please transfer me to Jester or a medical unit with cubical . . . in this region because of family travel.

(Docket Entry No. 45, Exhibit C, pp. 1–2.) Plaintiff's grievance statement shows that defendant Jenkins did not prevent Ojeda from taking plaintiff to "mental health," and that plaintiff was taken to see the mental health staff at that time. Nothing in the record shows that it was defendant Jenkins's decision not to send plaintiff to Skyview or Jester IV, or that Jenkins had any personal involvement in the "budget cuts" or lack of available beds at that time. Plaintiff presents no probative summary judgment evidence in support of his speculation that he was denied a bed at Skyview or Jester IV because Jenkins believed his suicide threats were a ruse to obtain better housing.

Nor does plaintiff establish that defendants Sanders and/or Christian were deliberately indifferent to his safety or mental health needs immediately prior to plaintiff's attempted suicide. Plaintiff was informed that he could not be transferred to Skyview or Jester IV because there were no available beds. Contrary to plaintiff's assertion, he was not denied mental health care at his prison unit – he was denied a transfer to a psychiatric facility due to lack of available beds. The record shows that plaintiff received outpatient mental health services at his unit.

Plaintiff presents no probative summary judgment evidence that the defendants were deliberately indifferent to his serious medical, safety, or mental health needs prior to, or on, April 22, 2011.[1]

B.  Deliberate Indifference Following the Incident

Plaintiff was seen by Estelle Unit outpatient mental health services the morning of April 25, 2011, the Monday immediately following his Friday evening suicide attempt. Medical records for that examination reflect the following notes and observations:

> The pt was placed on CDO on 4/23/11, after attempted hanging on 4/22/11. The pt reported that he is 'depressed' over his cellblock 'being in trouble' (see ER note, 4/23/11). All medical tests following his hanging were negative (at FEW ER). During the present interview, there were no ligature marks, or even redness or swelling around the throat/neck area.
>
> A thorough review of the chart reveals a history of false claims, reports, behaviors motivated for secondary gain, as well as being demanding with psychiatric staff/providers for specific medications. The pt's diagnostic history reflects this as well.
>
> Information from clinical interview: The pt was seen collide on A2 while being observed by Security; he had been in the cell since 4/23/11. Upon arriving, the pt expressed anger toward this writer – solely related to being housed in G4 custody. He complained about mass punishment, when the 'troublemakers' are limited to 6 of his peers. The pt received a disciplinary case recently, which he anticipates will delay him getting promoted in his custody level.
>
> The pt began discussing [the] psychotic episode he had 'several days ago.' He spoke of his head 'pounding' and 'blacking out' so that 'I don't know what I'm doing.' He claimed that he was 'stressing,' with his next memory of

---

[1] Plaintiff's self-styled "affidavits" and responses to the motions for summary judgment were not filed under penalty of perjury.

10

> waking in FEWER. He claimed that he recently received a cell change (same cellblock) which had helped (there is reference to this pt fearing inmates in a note dated 8/4/09, Psych Clinic note, Pack Unit) – suspect this may either be the motive for his recent behaviors or a contributing factor.
>
> The pt denied H/SI at this present time; made a vague threat by referencing hurting himself in the past (he refused to report anything specific; his chart reflects that he told nursing he cut wrist back in 2007; however notes from 2007 at [Skyview Crisis Management] indicate that the pt has no history of self-harm). The pt refused to respond regarding self-harm plan.

(Docket Entry No. 46, p. 64.) The mental health care provider was of the clinical opinion that plaintiff was at a low imminent risk for a potentially lethal suicide attempt at that time, and that constant direct observation could be discontinued. *Id.*, p. 65.

Plaintiff was seen in clinic on May 3, 2011, asking for a floor locker in his administrative segregation cell. He was examined by a mid-level provider, who reported in the chart that plaintiff had no foot complaints, was not disabled, and "was a tall/very muscular [administrative segregation] offender who should be able to reach his regular cell locker." Finding no medical justification for the requested floor locker, the provider denied plaintiff's request. *Id.*, p. 67. On May 5, 2011, plaintiff was seen in a sick call exam for shoulder pain, at which time he was given anti-inflammatory and pain relief medication and a medical locker pass. *Id.*, p. 69.

On May 9, 2011, plaintiff was seen by outpatient mental health services for a routine follow-up psychiatric evaluation. *Id.*, p. 71. He reported that he was doing better after being transferred to a different wing, and was taking his Prozac as prescribed. His mood was not

11

depressed and he denied suicide ideation. No evidence of psychotic or manic symptoms were noted. *Id.*, p. 72. The mental health provider noted that plaintiff's record "showed that he had a hanging attempt which was suspected to be a manipulative behavior to get change in his cell assignment." *Id.*, p. 71. Plaintiff's Prozac prescription was renewed, and no changes were made to his plan of care. On June 16, 2011, plaintiff reported to a sick call exam with seborrhea, which was treated with medicated shampoo. A mental health outpatient clinic note dated June 17, 2011, reported that plaintiff had filed a grievance against the mental health care provider for not sending him to inpatient psychiatric care. The note referenced plaintiff's low risk of suicide assessment dated April 25, 2011, and plaintiff's statement of May 9, 2011, that he was not depressed and was no longer having suicidal thoughts. *Id.*, p. 78.

Plaintiff was seen in clinic on June 23, 2011, complaining of hemorrhoids. He was treated with medicated cream and returned to his cell. *Id.*, p. 79–83. He was examined by outpatient mental health services on August 10, 2011, for medical clearance on administrative segregation housing following a disciplinary charge. *Id.*, p. 85. On September 16, 2011, he was seen in clinic requesting a referral to physical therapy for back pain. *Id.*, p. 86. He was subsequently diagnosed with arthritis in his hands and shoulders, and given medication, therapeutic exercises, and a back support belt. *Id.*, p. 88.

Outpatient mental health services examined plaintiff on October 5, 2011. During the patient interview, plaintiff was reported as polite and cordial. He discussed the pending

appeal of his sexual assault conviction, and stated his participation in a cognitive intervention class was helping him see situations from a different perspective. *Id.*, p. 89. He anticipated being released on parole and living with an aunt. He complained that one of his medications was making him sleepy and caused him to "get a case." *Id.* Plaintiff expressed no suicidal or self harm ideations, and stated that he was in compliance with his psychiatric medications. *Id.*, p. 90. On October 24, 2011, he told outpatient mental health services that the Prozac was helping with his depression, and that he was functioning well. No manic or psychotic symptoms were observed. *Id.*, p. 91. On November 2, 2011, he told outpatient mental health services that he had requested participation in the Sex Offender Treatment Program in anticipation of his parole, and that he remained free of suicidal or self harm ideations. At his December 1, 2011, appointment with outpatient mental health services, plaintiff was "upbeat" and reported continuing his education while awaiting parole and the SOTP. He remained compliant with his medications and was without suicide or self harm ideations. *Id.*, pp. 99–100.

Plaintiff claims that defendants were deliberately indifferent to his medical needs by refusing to transfer him to an inpatient psychiatric care prison unit following his suicide attempt, and in failing to provide him appropriate mental health care and medical care for his injured back. As shown above, the medical records state that there were no available beds at the two psychiatric units at that time, and plaintiff presents no probative summary

judgment evidence to the contrary.[2] Plaintiff fails to show that one or more of the defendants made an affirmative election not to transfer plaintiff to Skyview or Jester IV, and no deliberate indifference regarding a transfer is shown.

Plaintiff specifically argues that it was defendant Jenkins who refused to let him be transferred to Skyview or Jester IV for psychiatric inpatient care following the incident. In his affidavit submitted in support of his motion for summary judgment, defendant Jenkins testifies as follows:

> [Hendrix] alleges I acted with deliberate indifference to his serious medical needs. Specifically,[he] claims that on April 22, 2011, I instructed University of Texas Medical Branch ('UTMB') employees to deny him transfer to a medical unit after an alleged suicide attempt. I am writing this affidavit in response to these allegations. In preparing this affidavit, I have reviewed [plaintiff's] Original Complaint, grievance records, and relevant medical records.
>
> I am not a medical professional. I am not a UTMB employee. I do not diagnose medical conditions. UTMB employees are not in my chain of command. I cannot order UTMB medical professionals to reach a particular medical decision.
>
> I do not recall if I contacted UTMB medical professional[s] on April 22, 2011, to alert them that I believed [Hendrix] was attempting to manipulate staff in order to obtain a transfer to another TDCJ unit. I do notify UTMB medical professionals when I believe an offender is attempting to manipulate staff in order to obtain a transfer to a different TDCJ unit; however, they make the ultimate decision. In this case, the UTMB medical professional[s] concluded that [Hendrix] sustained no injuries from his ill-fated attempt to hang himself.

---

[2]Plaintiff claims that one or more of the defendants told him he could not go to the psychiatric unit due to "budget cuts." Plaintiff contends that the statement was false and an excuse to deny him access to prison psychiatric facilities. Plaintiff presents no probative summary judgment evidence supporting this speculative and conclusory assertion.

> The UTMB employees further determined that 'a thorough review of the chart reveals a history of false claims, reports, behaviors motivated for secondary gain, as well as being demanding with psychiatric staff/providers for specific medications.'
>
> I made no medical decisions and provided no medical treatment to [Hendrix]. I perform my duties as a TDCJ employee to the best of my abilities and with the good faith belief that my actions are in accordance with the law.

(Docket Entry No. 50, Affidavit of Defendant Robert Jenkins.)

Plaintiff presents no probative summary judgment evidence supporting his claim that defendant Jenkins was deliberately indifferent to his health, safety, or serious medical needs. Plaintiff's bare assertions that Jenkins "knew he did wrong" and that he told medical staff not to transfer plaintiff to available beds at Skyview or Jester IV are unsupported in the record, and fail to raise a genuine issue of material fact precluding summary judgment. The medical records and other competent summary judgment evidence demonstrate that plaintiff was provided emergency medical treatment, both in prison and at an outside hospital emergency facility, after being found unconscious in his cell. Upon his return to his prison unit from the hospital facility, and in light of his negative lab tests and imaging results, plaintiff was placed under continuous direct observation until he could be examined by mental health staff. Mental health staff subsequently examined and treated him, and he reported significant improvement without thoughts of suicide or self harm, particularly after he was assigned to different housing in his unit. Plaintiff fails to show that defendants were

deliberately indifferent to his serious medical or mental health needs by providing for his post-incident care on an outpatient basis.

## V. CONCLUSION

Defendants' motions for summary judgment (Docket Entries No. 45, 50) are **GRANTED** and this case is **DISMISSED WITH PREJUDICE**. Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the 23rd day of July, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE